1 | Erik Schlenker-Goodrich, *pro hac vice,* New Mexico # 17875
Western Environmental Law Center
2 | P.O. Box 1507
Taos, New Mexico 87571
3 | Tel:  (505) 751-0351
Fax: (505) 751-1775
4 |
Peter M.K. Frost, *pro hac vice*, Oregon Bar # 91184
5 | Western Environmental Law Center
1216 Lincoln Street
6 | Eugene, Oregon 97401
Tel: (541) 485-2471
7 | Fax: (541) 485-2457

8 | Counsel for Plaintiff

9 | Sharon E. Duggan, California Bar # 105108
2070 Allston Way, Suite 300
10 | Berkeley, California 94704
Tel: (510) 647-1904
11 | Fax: (510) 647-1905

12 | Local Counsel for Plaintiff

13 |

14 | **IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

15 |

16 | ENVIRONMENTAL PROTECTION
INFORMATION CENTER,
17 |
        Plaintiff,
18 |
        v.
19 |
Jack BLACKWELL, in his official capacity
20 | as Regional Forester for the Southwest
Pacific Region of the United States Forest
21 | Service, James D. FENWOOD in his
official capacity as Forest Supervisor for the
22 | Mendocino National Forest, James F.
GIACHINO, in his official capacity as
23 | District Ranger for the Grindstone Ranger
District of the Mendocino National Forest,
24 | and UNITED STATES FOREST SERVICE,
an agency of the United States Department
25 | of Agriculture,

26 |        Defendants.

27 |

Civil Action No. 03-4396-EMC
Date: June 9, 2004
Time: 10:30 a.m.
Courtroom: C, 15th Floor

**PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT AND
INJUNCTIVE RELIEF**

**MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF
MOTION FOR SUMMARY
JUDGEMENT AND INJUNCTIVE
RELIEF**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................. iii

INTRODUCTION............................................................................................................... 1

STATEMENT OF THE ISSUES TO BE DECIDED..................................................... 1

STATEMENT OF THE RELEVANT FACTS............................................................... 2

LEGAL STANDARDS...................................................................................................... 5

    The Standard of Review for Plaintiff's Motion for Summary
    Judgement........................................................................................................... 5

    The Standard of Review for Plaintiff's Motion for Injunctive
    Relief................................................................................................................... 7

ARGUMENT...................................................................................................................... 8

I. THE DIVIDE AUGER TIMBER SALE VIOLATES NEPA................................... 8

    A. The Forest Service Failed to Take a Hard Look at the Divide Auger Timber Sale's
    Cumulative Impacts to Late Successional Wildlife and Wildlife Habitat........................... 8

        1. NEPA's Hard Look Requirement................................................................. 8

        2. The Forest Service's Failure to Take a Hard Look at Cumulative Impacts to Late
        Successional Wildlife & Wildlife Habitat......................................................... 10

    B. The Forest Service Failed to Supply a Convincing Statement of Reasons Justifying a
    Finding of No Significant Impact........................................................................ 17

        1. The Forest Service's Duty to Justify a FONSI.......................................... 17

        2. The Forest Service's Conflation of Substantive and Procedural Duties.................... 18

        3. The Forest Service's Failure to Justify the FONSI................................... 20

    C. The Forest Service Failed to Consider a Reasonable Range of Alternatives................. 25

        1. The Forest Service's Obligation to Consider a Reasonable Range of Alternatives.... 25

        2. The Forest Service's Unreasonable Range of Alternatives......................... 26

    D. The Forest Service's Failure to Diligently Involve the Public........................ 28

II. THE DIVIDE AUGER TIMBER SALE VIOLATES NFMA.............................. 31

    A. The Forest Service's Duty to Ensure Species Diversity and Viability............. 31

B. MIS in the Mendocino National Forest...................................................................... 32

C. The Forest Service's Failure to Comply with its Viability Duties.................................... 32

    1. Concerns Over Northern Goshawk, American Marten, Pacific Fisher, and Northern Spotted Owl Viability............................................................................................. 32

    2. The Forest Service's Monitoring Duties in the Mendocino National Forest............. 34

    3. The Proxy on Proxy Approach..................................................................... 35

CONCLUSION.......................................................................................................... 39

1

**TABLE OF AUTHORITIES**

2

**CASES**

3

Alaska Wilderness Recreation and Tourism Assn. v. Morrison,
67 F.3d 723 (9th Cir. 1995)................................................................................... 7

4

Amoco Production Co. v. Village of Gambell, Alaska, 480 U.S. 531(1987)................................. 7

5

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-249 (1986)...................................... 6

6

Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc., 462 U.S. 87, 97 (1983)................ 8

7

Blue Mountains Biodiversity Alliance v. Blackwood,161 F.3d 1208  (9th Cir. 1998)...............8, 18

8

Bob Marshall Alliance v. Hodel, 852 F.2d 1223 (9th Cir. 1988).................................... 25

9

Celotex Corp. v. Catrett, 477 U.S. 317 (1986)................................................ 6

10

Center for Biological Diversity v. U.S. Forest Service,
349 F.3d 1157 (9th Cir. 2003).............................................................. 9, 26

11

12

Chevron U.S.A. v. Natural Resources Defense Council, 467 U.S. 837 (1984).............................. 7

13

Citizens Against Toxic Sprays v. Bergland, 428 F. Supp. 908 (D. Or. 1977)................................ 27

14

Citizens for a Better Henderson v. Hodel, 758 F.2d 1051 (9th Cir. 1985) ...................................... 27

15

Citizens for Better Forestry v. U.S. Department of Agriculture, 341 F.3d 961 (9th Cir. 2003)...... 29

16

Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402 (1971)................................... 6

17

City of Carmel-By-The-Sea v. U.S. Department of Transportation,
123 F.3d 1142 (9th Cir. 1997)................................................................ 9, 26

18

19

Earth Island Institute v. U.S. Forest Service, 351 F.3d 1291 (9th Cir. 2003).................. 6, 9, 28, 29

20

Forest Conservation Council v. U.S. Forest Service, 66 F.3d 1489 (9th Cir. 1995)........................ 8

21

Forest Guardians v. Forest Service, 180 F.Supp.2d 1273 (D. N.M 2001).............................. 35, 36

22

Grand Canyon Trust v. FAA, 290 F.3d 339 (D.C. Cir. 2002)........................................ 7

23

Idaho Conservation League v. Mumma, 956 F.2d 1508 (9th Cir. 1992)........................................ 27

24

Idaho Sporting Congress v. Alexander, 222 F.3d 562 (9th Cir. 2000).............................. 8

25

Idaho Sporting Congress v. Rittenhouse, 305 F.3d 957 (9th Cir. 2002)................................... 35, 36

26

Idaho Sporting Congress v. Thomas, 137 F.3d 1146 (9th Cir. 1998)............................. 6, 18, 20, 29

Inland Empire Public Lands Council v. U.S. Forest Service,

27

88 F.3d 754 (9th Cir. 1996)............................................................................ 32, 35, 36

Kern v. U.S. Bureau of Land Management,
284 F.3d 1062 (9th Cir. 2002)............................................................. 8, 10, 12, 20, 31

Kootenai Tribe of Idaho v. Veneman, 313 F.3d 1094 (9th Cir. 2002)...................................... 25, 26

Makua v. Rumsfeld, 163 F. Supp. 2d 1202 (D. Ha. 2001).................................................. 20

Marble Mountain Audubon Society v. Rice, 914 F.2d 179 (9th Cir. 1990)................................... 16

Marsh v. Oregon Natural Resources Council, 490 U.S. 360 (1989)........................................... 6

Motor Vehicle Manufacturers Association of the United States, Inc. v. State Farm Mutual
Automobile Ins. Co., 463 U.S. 29 (1983).................................................................... 6

Muckleshoot Indian Tribe v. U.S. Forest Service, 177 F.3d 800 (9th Cir. 1999) .......................... 27

National Parks and Conservation Assn. v. Babbitt, 241 F.3d 722 (9th Cir. 2001)................. 7, 8, 18

National Wildlife Federation v. Babbitt, 128 F. Supp. 2d 1274 (E.D. Cal. 2000)........................ 19

Natural Resources Defense Council v. Morton, 458 F.2d 827 (D.C. Cir. 1972)........................... 27

Neighbors of Cuddy Mountain v. U.S. Forest Service,
137 F.3d 1372 (9th Cir. 1998)......................................................................... 10, 11

Northern Cheyenne Tribe v. Hodel, 842 F.2d 224 (9th Cir. 1988)........................................... 7

Pacific Coast Federation of Fishermen's Ass'n v. National Marine Fisheries Service,
265 F.3d 1028 (9th Cir. 2001)............................................................................. 17

Portland Audubon Society v. Lujan, 795 F. Supp. 1489 (D. Or. 1992)...................................... 19

Public Citizen v. Department of Transportation, 316 F.3d 1002 (9th Cir. 2003)........................... 18

Robertson v. Methow Valley Citizens, 490 U.S. 332 (1989)................................................ 29

Salmon River Concerned Citizens v. Robertson, 32 F.3d 1346 (9th Cir. 1994)............................... 5

Save the Yaak Committee v. Block, 840 F.2d 714 (9th Cir. 1988)........................................... 7

Seattle Audubon Society v. Evans, 771 F. Supp. 1081 (W. D. Wash. 1994),
aff'd, 952 F.2d 297 (9th Cir. 1991)...................................................................... 19

Sierra Club v. Bosworth, 199 F.Supp.2d 971 (N.D. Ca. 2002)............................................ 9, 29

Sierra Club v. Martin, 168 F.3d 1 (11th Cir. 1999)...................................................... 35

Sierra Club v. U.S. Forest Service, 843 F.2d 1190 (9th Cir. 1988)........................................ 21

Utah Environmental Congress v. Zieroth, 190 F.Supp.2d 1265 (D. Ut. 2002)................................ 36

Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,
435 U.S. 519 (1978)........................................................................................................ 26


**STATUTES**

5 U.S.C. § 552(a)(6)(A)(I)............................................................................................... 30

5 U.S.C. § 706................................................................................................................... 6

5 U.S.C. § 706(2)(A)..................................................................................................... 6, 39

5 U.S.C. § 706(2)(D)..................................................................................................... 6, 39

16 U.S.C § 1604............................................................................................................... 31

16 U.S.C. § 1604(g)(3)(b)................................................................................................ 31

16 U.S.C. § 1604(i).................................................................................................... 31, 35

42 U.S.C. § 4332(2)(C).................................................................................................... 18

42 U.S.C. § 4332(E)......................................................................................................... 25

42 U.S.C. § 4332(2)(C)(iii).............................................................................................. 25


**REGULATIONS, COURT RULES, AND POLICIES**

Council on Environmental Quality, *Considering Cumulative Effects Under the National
Environmental Policy Act* (1997).............................................................................. 10, 11

Fed. R. Civ. P. 56(c)........................................................................................................... 6

Forty Most Asked Questions Concerning CEQ's NEPA Regulations,
48 Fed. Reg. 18,026 (March 16, 1981)............................................................................ 27

U.S. Fish and Wildlife Service & National Marine Fisheries Service, Endangered Species
Consultation Handbook, Procedures for Conducting Consultation and Conference Activities
Under Section Seven of the Endangered Species Act (March 1998)............................... 24

66 Fed. Reg. 3206 (January 12, 2001).............................................................................. 14

66 Fed. Reg. 3206-07......................................................................................................... 14

36 C.F.R. §§ 219.10(a)-(b)................................................................................................ 31

36 C.F.R. § 219.10(e)................................................................................................... 31, 35

36 C.F.R. § 219.11(d)........................................................................................................ 34

1    36 C.F.R. § 219.12(d).................................................................................... 35

2    36 C.F.R. § 219.19....................................................................................... 32

3    36 C.F.R. 219.19(a)(1)........................................................................ 32, 34, 35

4    36 C.F.R. § 219.19(a)(6)............................................................................... 35

5    40 C.F.R § 1500.1(a)...................................................................................... 8

6    40 C.F.R. §§ 1500.2(d).................................................................................. 28

7    40 C.F.R. § 1502.14...................................................................................... 26

8    40 C.F.R. § 1502.24...................................................................................... 29

9    40 C.F.R. § 1502.3........................................................................................ 18

10    40 C.F.R. §§ 1502.9(a)-(b)........................................................................... 28

11    40 C.F.R. § 1506.6(a).................................................................................... 28

12    40 C.F.R. § 1508.27(a)...................................................................... 9, 11, 15, 18

13    40 C.F.R. § 1508.27(b)...................................................................... 9, 11, 15, 18

14    40 C.F.R. §§ 1508.27(b)(3)........................................................................... 21

15    40 C.F.R. 1508.27(b)(4)................................................................................ 21

16    40 C.F.R. § 1508.27(b)(10)........................................................................... 21

17    40 C.F.R. § 1508.7......................................................................................... 9

18    40 C.F.R. § 1508.8(a)..................................................................................... 9

19    40 C.F.R. § 1508.8(b)..................................................................................... 9

20    50 C.F.R. § 402.01........................................................................................ 24

21

22

23

24

25

26

27

Plaintiff Environmental Protection Information Center ("EPIC") hereby notices this motion for summary judgment and injunctive relief, to be heard before Hon. Edward M. Chen, on Wednesday, June 9, 2004, at 9:30 am, 15th Floor, Courtroom C, at the U.S. Courthouse, 450 Golden Gate Avenue, San Francisco, California, 94102.

EPIC seeks a declaratory judgment that Defendants (hereafter "Forest Service") has violated federal laws as specified below and a permanent injunction enjoining the Forest Service from authorizing or allowing any logging or other ground-disturbing activities within the Divide Auger project area pending full compliance with the National Environmental Policy Act ("NEPA") and National Forest Management Act ("NFMA").

**INTRODUCTION**

The Divide Auger Timber Sale threatens to commercially log 6,866 trees – 4.5 million board feet – within ancient forest lands nestled in Thomes Creek's headwaters between the untrammeled Yolla Bolly – Middle Eel Wilderness and the Buttermilk Late Successional Reserve, a landscape managed to protect wildlife dependent on these ancient forests.  To justify the commercial logging, the Forest Service prepared an exceptionally flawed Environmental Assessment ("EA") that turns a blind eye to these ancient forests' critical ecological and biological roles.  In the process, the Forest Service has run afoul of its legal duties pertaining to the preparation of environmental analyses under the National Environmental Policy Act of 1969 ("NEPA") and the protection of diverse and viable late successional wildlife species under the National Forest Management Act of 1976 ("NFMA").

**STATEMENT OF THE ISSUES TO BE DECIDED**

1.  Whether the Forest Service failed to take a hard look at the cumulative environmental consequences of the Divide Auger Timber Sale to wildlife and wildlife habitat and therefore violated NEPA.

2.  Whether the Forest Service failed to consider a reasonable range of alternatives for the Divide Auger Timber Sale and therefore violated NEPA.

1      3.  Whether the Forest Service violated NEPA by failing to prepare an Environmental

2  Impact Statement ("EIS").

3      4.  Whether the Defendants failed to afford the public adequate opportunity to participate

4  in the decision-making process for the Divide Auger Timber Sale and therefore violated NEPA.

5      5.  Whether the Defendants failed to take necessary actions to ensure the diversity and

6  viability of species in authorizing the Divide Auger Timber Sale and therefore violated NFMA.

7                    **STATEMENT OF THE RELEVANT FACTS**

8      The Divide Auger Timber Sale takes place in the Thomes Creek Watershed within the

9  Mendocino National Forest.  AR 4593.  Because it falls within the range of the Northern Spotted

10  Owl, a species listed as threatened pursuant to the Endangered Species Act ("ESA"), the

11  Mendocino National Forest is subject to the 1994 Northwest Forest Plan.  AR 1986.  The

12  provisions of the Northwest Forest Plan are implemented through the Mendocino National Forest

13  Land and Resource Management Plan ("Forest Plan") dated February 1, 1995.  See AR 1924-

14  2164.  The Forest Plan establishes:

15          management direction and associated long-range goals and objectives[,] specifies
            the standards, approximate timing, and vicinity of practices necessary to
16          implement that direction[,] and establishes monitoring and evaluation
            requirements needed to ensure that direction is being carried out and to determine
17          if outputs and effects have been reasonably estimated.

18  AR 1933.

19      Fulfilling one of the Forest Plan's tasks, the Forest Service completed a Watershed

20  Analysis Report for Thomes Creek Watershed dated April 1, 1997.  See AR 2637-2779.  The

21  Watershed Analysis is "an important step toward landscape-scale management of forest resources.

22  Watershed analysis has a broad, ecosystem management context, and the analysis is used to assist

23  in decision making under [NEPA]."  AR 2641.  The Forest Service also completed a Forest-Wide

24  Late Successional Reserve Assessment ("LSR Assessment") in November of 2000.  See AR

25  3343-3464.  Late Successional Reserves ("LSRs") were created under the Northwest Forest Plan

26  to "maintain a functional, interactive, late-successional forest ecosystem.  They are designed to

27

1   serve as habitat for late-successional and old-growth related species including the northern spotted

2   owl." AR 1615.

3        Based on findings and direction within the Forest Plan, and referencing aspects and

4   conclusions of the Watershed Analysis and LSR Assessment, the Divide Auger Timber Sale was

5   authorized by a June 6, 2003 Decision Notice ("DN") and Finding of No Significant Impact

6   ("FONSI"). AR 4586. The DN/FONSI was based on an Environmental Assessment ("EA")

7   conducted specifically for the Divide Auger Timber Sale. See AR 4593-4703. The DN/FONSI

8   authorizes the implementation of Alternative C of the EA. AR 4586-4589. Alternative C

9   provides for the commercial logging of 4.5 million board feet ("MMBF") of predominantly late-

10  successional forest from 21 separate timber units, divided into northern and southern sections, in

11  the Thomes Creek Watershed, with a net total of 264 acres over a project area totaling 2,882

12  acres. AR 4533, 4593. Of the 264 acres, 40 acres would be retained "to provide habitat for old

13  growth wildlife and vegetation." AR 4593. The Forest Service would apply two methods of

14  logging: (1) 101 acres would be cut using "overstory removal"; and (2) 123 acres would be cut

15  using "green tree retention." AR 4593, 4604, 4611 (describing silvicultural prescriptions). The

16  proposed action also includes road maintenance and improvement activities on 20 miles of

17  existing roads. AR 4593.

18       The Forest Service's "Purpose and Need" for pursuing this commercial logging project, as

19  set forth in the EA, is: (1) to produce timber and achieve an even-aged, fire resilient forest while

20  contributing to the economic stability of rural communities; (2) minimize the spread of insect and

21  disease pathogens to prevent adverse impacts to the forest; (3) increase the presence of mixed

22  conifers, decrease the presence of red and white fir, and protect and encourage the growth of oak,

23  all to purportedly maintain healthier stands; and (4) reduce natural fuels to levels manageable by

24  hand crews in the event of fire, in part because the project area is allegedly important to prevent

25  wildfires from reaching the Yolla Bolly – Middle Eel Wilderness. AR 4594-4595.

26       Beyond Alternative C, the chosen alternative, the Forest Service considered two other

27

1   alternatives.  Alternative A, cited as the "no action" alternative, provides for no commercial

2   logging of trees, but, as part of the purportedly pre-authorized baseline, includes pre-commercial

3   thinning projects, the removal of hazard trees along roads, and road maintenance activities.  AR

4   4600-4601.  Alternative B involves the commercial logging of 1.3 MMBF in 61.15 acres within

5   the southern units of the project area, pre-commercial thinning in the northern units of trees with

6   less than 8.0 inch diameter base height, and road maintenance over approximately 15.6 miles of

7   existing road.  AR 4601-4602.  The Forest Service identified only three issues with which to

8   assess each alternative: (1) insects and disease; (2) use of the registered fungicide Borax to

9   minimize the spread of disease; and (3) visual impacts.  AR 4596, 4597.  The EA explicitly

10  dropped "soil erosion and water quality" from further analysis.  AR 4597, 4598.

11      In preparing the Divide Auger EA, the Forest Service completed several internal

12  "specialist reports" referenced but not included within the EA.  For our purposes, the particularly

13  relevant specialist reports include the: (1) Biological Assessment ("Wildlife BA") dated March

14  25, 2003 (AR 4411-4446); (2) Wildlife Specialist's Report ("MIS Report") dated April 1, 2003

15  (AR 4447-4484); and (3) Biological Evaluation ("Wildlife BE") dated June 6, 2003 (AR 4530-

16  4584).  Additionally, the U.S. Fish and Wildlife Service prepared a Biological Opinion dated June

17  4, 2003.  AR 4489-4529.  Neither the internal specialist reports nor the Biological Opinion were

18  circulated for public review and comment as part of the NEPA process.  AR 4314.  Indeed, each

19  of these documents, with the exception of the Fuels Analysis, was completed subsequent to the

20  public review and comment period provided by the Forest Service and initiated on November 6,

21  2002.  Id.

22      Another set of documents of particular relevance are the Programmatic Biological

23  Assessment, Road Maintenance and Repair, Mendocino National Forest ("1998 Road BA"), dated

24  July 9, 1998, and its addendums dated September 9, 1998 and February 23, 2001, and the

25  Programmatic Biological Evaluation, Road and Trail Maintenance and Repair, Mendocino

26  National Forest ("2001 Road BE"), dated February 22, 2001.  AR 2913-2935 (1998 Road BA),

27

2936-2938 (addendum I to 1998 Road BA), 3480-3515 (2001 Road BE), 3516-3523 (addendum II

to 1998 Road BA).  The 1998 Road BA purports to analyze "road maintenance and repair to

determine their effect upon federally Threatened and Endangered species, and to determine

whether formal consultation or conferencing with the US Fish and Wildlife Service (FWS) is

required."  AR 2914.  The 2001 Road BE is largely similar, but, instead of analyzing threatened

and endangered species, analyzes "Forest Service Region 5 Sensitive species," and does not

determine whether consultation with the FWS is necessary, but, rather, seeks "to determine

whether [road maintenance and repair] would lead toward the federal listing on the Endangered

Species Act of 1973 as amended."  AR 3481.  The 1998 Road BA and 2001 Road BE, as non-

NEPA documents, were not circulated for public review or comment.  The actions considered by

the 1998 Road BA and 2001 Road BE were allowed to proceed based on a Forest Service decision

document signed November 8, 1998.  SAR 0002.

Throughout the preparation of the Divide Auger EA, EPIC expressed concerns about and

participated in the Divide Auger Timber Sale through comments, letters, and Freedom of

Information Act Requests.  See AR 3880-3886, 3957-3972, 3984-3989, 4002-4003, 4037-4038,

4245-4247, 4316-4334, 4390-4391, and 4404-4406.  Based on the Forest Service's failure to

address these concerns, EPIC appealed the DN/FONSI on July 29, 2003.  AR 4708.  The Forest

Service, however, denied EPIC's appeal on September 11, 2003.  AR 4749.  To protect the land

and wildlife impacted by the Divide Auger Timber Sale, EPIC filed this lawsuit on September 30,

2003.[1]

## LEGAL STANDARDS

### The Standard of Review for Plaintiff's Motion for Summary Judgment

Summary judgment must be granted where "there is no genuine issue as to any material

---

[1] Plaintiff has standing to bring this lawsuit, as demonstrated by the Declarations of Cynthia Elkins and Christine Ambrose filed concurrently with this brief.  Salmon River Concerned Citizens v. Robertson, 32 F.3d 1346, 1352 n.10 (9th Cir. 1994).

fact and ... the moving party is entitled to judgement as a matter of law." Fed. R. Civ. P. 56(c). The United States Supreme Court encourages district courts to utilize summary judgement in appropriate cases. Celotex Corp. v. Catrett, 477 U.S. 317, 322-327 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-250 (1986). Plaintiff's motion raises purely legal issues on undisputed facts, rendering summary judgement appropriate.

Judicial review of Plaintiff's claims are governed by the Administrative Procedure Act ("APA"), 5 U.S.C. § 706; Earth Island Institute v. U.S. Forest Service, 351 F.3d 1291, 1300 (9th Cir. 2003). Pursuant to the APA, courts "shall ... set aside agency action" found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law." 5 U.S.C §§ 706(2)(A), (D). According to the Supreme Court, agency action is "arbitrary and capricious":

> if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decisions that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Motor Vehicle Manufacturers Association of the United States, Inc. v. State Farm Mutual Automobile Ins. Co., 463 U.S. 29, 43 (1983). In making this determination, courts are to "consider whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgement." Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416 (1971); See also Idaho Sporting Congress v. Thomas, 137 F.3d 1146, 1149 (9th Cir. 1998). While courts must defer to the informed exercise of agency discretion under § 706(2)(A), "courts must independently review the record in order to satisfy themselves that the agency has made a reasoned decision based on its evaluation of the evidence." Earth Island Institute, 351 F.3d at 1301 (citing Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 377 (1989)).

Notably, while the Forest Service is afforded deference in interpreting and implementing obligations Congress has specifically entrusted the agency to administer, such as those in NFMA,

1  deference is *not* afforded to the agency's interpretation and implementation of its NEPA duties.

2  See Chevron U.S.A. v. Natural Resources Defense Council, 467 U.S. 837, 842-844 (1984)

3  (analyzing the validity of Environmental Protection Agency's Clean Air Act regulations, where

4  that agency was created by Congress to administer the Clean Air Act and other pollution statutes),

5  Grand Canyon Trust v. FAA, 290 F.3d 339, 342 (D.C. Cir. 2002) ("the court owes no deference to

6  the FAA's interpretation of NEPA or the CEQ regulations because NEPA is addressed to all

7  federal agencies and Congress did not entrust administration of NEPA to the FAA alone")

8  (citations omitted).

9  **The Standard of Review for Plaintiff's Motion for Injunctive Relief**

10      The standard for determining whether to issue a permanent injunction requires a two-part

11  inquiry.  Amoco Production Co. v. Village of Gambell, Alaska, 480 U.S. 531, 542 (1987).  This

12  Court must first determine whether any statute restricts its traditional equity jurisdiction.  Id.  If no

13  statute restricts its equity jurisdiction, then this Court must engage in the traditional equity

14  balancing to determine whether an injunction is appropriate.  Id.; accord National Parks and

15  Conservation Assn. v. Babbitt, 241 F.3d 722, 737 (9th Cir. 2001).

16      The Ninth Circuit has held that "[t]here is nothing in NEPA to indicate that Congress

17  intended to limit [a] court's equitable jurisdiction."  Save the Yaak Committee v. Block, 840 F.2d

18  714, 722 (9th Cir. 1988), citing Northern Cheyenne Tribe v. Hodel, 842 F.2d 224, 230 (9th Cir.

19  1988).  Accordingly, this Court must consider the traditional bases for injunctive relief, which are

20  "irreparable injury and inadequacy of legal remedies."  Amoco Production Co., 480 U.S. at 542.

21      There is no presumption of irreparable injury when an agency fails to evaluate the

22  environmental impact of a proposed action.  Id. at 545.  However, "[e]nvironmental injury, by its

23  nature, can seldom be adequately remedied by money damages and is often permanent or at least

24  of long duration, i.e., irreparable."  Id.  "When the 'proposed project may significantly degrade

25  some human environmental factor,' injunctive relief is appropriate."  National Parks Conservation

26  Assn. v. Babbitt, 241 F.3d at 737 (quoting Alaska Wilderness Recreation and Tourism Assn. v.

27

1    Morrison, 67 F.3d 723, 732 (9th Cir. 1995)).  To obtain an injunction in the Ninth Circuit, a party

2    need not prove that irreparable harm will in fact occur – it must show only that injury or harm

3    *might* occur in the absence of the requested injunction.  National Parks Conservation Assn. v.

4    Babbitt, 241 F.3d at 737 (enjoining ongoing cruise ship uses because they "might" cause

5    irreparable harm); accord Idaho Sporting Congress v. Alexander, 222 F.3d 562, 568 (9th Cir.

6    2000) (stating that the "possibility" of irreparable harm from any resumed logging justifies an

7    injunction).  Further, where a party demonstrates the possibility of irreparable harm to the

8    environment, and requests an injunction to prevent such harm, any opposing party bears the

9    burden of demonstrating that "unusual circumstances" exist that weigh against the request.

10   National Parks Conservation Assn. v. Babbitt, 241 F.3d at 738 (citing Forest Conservation

11   Council v. U.S. Forest Service, 66 F.3d 1489, 1496 (9th Cir. 1995) (stating in the context of a

12   challenge to forest management guidelines, that timber companies "should be allowed to present

13   evidence to the court that 'unusual circumstances' weigh against the injunction sought.")).

14                                              **ARGUMENT**

15   **I.  THE DIVIDE AUGER TIMBER SALE VIOLATES NEPA**

16       **A.  The Forest Service Failed to Take a Hard Look at the Divide Auger Timber Sale's
             Cumulative Impacts to Late Successional Wildlife and Wildlife Habitat**

17

18       **1. NEPA's Hard Look Requirement**

19           NEPA is "our basic national charter for protection of the environment."  Blue Mountains

     Biodiversity Alliance v. Blackwood, 161 F.3d 1208, 1215-1216 (9th Cir. 1998) (quoting 40 C.F.R

20

     § 1500.1(a).  As an "action-forcing" mechanism, NEPA is designed to achieve two principle

21

22   objectives.  Kern v. U.S. Bureau of Land Management, 284 F.3d 1062, 1066-67 (9th Cir. 2002).

     First, to ensure that an agency "consider[s] every significant aspect of the environmental impact of

23

     a proposed action."  Id. (quoting Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.,

24

25   462 U.S. 87, 97 (1983). And second, to "ensure[] that the agency will inform the public that it has

     indeed considered environmental concerns in its decisionmaking process."  Id.  "In order to

26

27

1   accomplish this, NEPA imposes procedural requirements designed to force agencies to take a

2   'hard look' at environmental consequences." Earth Island Institute, 351 F.3d at 1300 (citing Kern,

3   284 F.3d at 1066).  Importantly, "[t]he procedures prescribed both in NEPA and the implementing

4   regulations are to be strictly interpreted 'to the fullest extent possible' in accord with the policies

5   embodied in the Act ... '[g]rudging, pro forma compliance will not do.'" Center for Biological

6   Diversity v. U.S. Forest Service, 349 F.3d 1157, 1166 (9th Cir. 2003) (citations omitted).

7           In taking the requisite "hard look," federal agencies must assess the direct, indirect, and

8   cumulative impacts of agency action to the human environment to determine, in terms of both

9   context and intensity, the impacts' significance.  See 40 C.F.R. § 1508.27(a), (b) (defining

10  "significantly").  A direct impact is caused by the action itself within the same time and place.  40

11  C.F.R. § 1508.8(a).  An indirect impact is caused by the action, but occurs later in time or farther

12  removed in distance, although it is reasonably foreseeable.  40 C.F.R. § 1508.8(b).  A cumulative

13  impact is defined as:

14          the impact on the environment which results from the incremental impact of the
            action when added to other past, present, and reasonably foreseeable future
15          actions regardless of what agency (Federal or non-Federal) or person undertakes
            such other actions.  Cumulative impacts can result from individually minor but
16          collectively significant actions taking place over a period of time.

17  40 C.F.R. § 1508.7.  Cumulative impacts must be assessed in "sufficient detail to be 'useful to the

18  decisionmaker in deciding whether, or how, to alter the program to lessen cumulative impacts."

19  Sierra Club v. Bosworth, 199 F.Supp.2d 971 (N.D. Ca. 2002) (quoting City of Carmel-By-The-

20  Sea v. U.S. Dept. of Transp., 123 F.3d 1142, 1160 (9th Cir. 1997).

21          To satisfy its cumulative impact duties, the Forest Service must do two things.  First, the

22  agency must list the past, present, and reasonably foreseeable projects in the area.  40 C.F.R. §

23  1508.7; Sierra Club v. Bosworth, 199 F.Supp.2d at 982-983.  Second, the agency must analyze

24  these projects in light of the proposed action.  Id.  If the Forest Service determines that certain

25  actions are not relevant to assess the cumulative impacts of the proposed action, the agency must

26  "demonstrat[e] the scientific basis for this assertion."  Id. at 983.

27    PLAINTIFF'S MTN. & MEM. FOR SUM. JUDG. AND INJ. REL.                          Page   9

1    The agency's analysis must be detailed; "[g]eneral statements about 'possible' effects and

2    'some risk' do not constitute a 'hard look' absent a justification regarding why more definitive

3    information could not be provided." Neighbors of Cuddy Mountain v. U.S. Forest Service, 137

4    F.3d 1372, 1380 (9th Cir. 1998). Without satisfying these requirements, "neither the courts nor the

5    public, in reviewing the Forest Service's decision[], can be assured that the Forest Service

6    provided the hard look it is required to provide." Id. at 1380. The importance of cumulative

7    impacts, especially in the context of the Divide Auger Timber Sale, cannot be underestimated. As

8    stated by the Ninth Circuit, where an agency fails to assess cumulative impacts, "[s]uch a

9    restricted analysis would impermissibly subject the decisionmaking process contemplated by

10   NEPA to 'the tyranny of small decisions.'" Kern, 284 F.3d at 1078 (quoting Council on

11   Environmental Quality, *Considering Cumulative Effects Under the National Environmental*

12   *Policy Act*, at 1 (1997) (hereafter "Considering Cumulative Effects").

13   **2. The Forest Service's Failure to Take a Hard Look at Cumulative Impacts to Late
     Successional Wildlife and Wildlife Habitat**

14   The Divide Auger EA does not fully address the Divide Auger Timber Sale's cumulative

15   impacts to wildlife and wildlife habitat dependent on late successional habitat.[2] This failure is

16   especially problematic because the Divide Auger's project area, nestled in the headwaters of

17   Thomes Creek, and abutting and between both the Yolla Bolly – Middle Eel Wilderness, and the

18   Buttermilk LSR, constitutes an important habitat link for late-successional species. See AR 2080

19   (stating that Three Prong Management Area – where the logging will occur – provides key

20   wildlife dispersal habitat for the Northern Goshawk, American Marten, Pacific Fisher,[3] and

21   Northern Spotted Owl), 4445-4446 (maps identifying project area). The EA does concede that

22   "critical [cumulative] effects on wildlife would include fragmentation of habitat and the reduction

23

24         [2] Late successional habitat is defined as timber strata M3P, M3G, M4S, M4P, M4G, M6G, and R4X. See

25   AR 2686 (defining "late successional"); 4580-4581 (defining timber strata system).

26         [3] The Fish and Wildlife Service determined on April 8, 2004 that the Pacific Fisher warrants protection as a
     threatened or endangered species under the ESA, but is precluded by other allegedly higher priority listing actions.

27   PLAINTIFF'S MTN. & MEM. FOR SUM. JUDG. AND INJ. REL.                                    Page 10

1    of suitable nesting, denning, and/or dispersal habitat for species dependent on mid to late

2    successional habitat." AR 4656.  However, nothing in the record demonstrates that the Forest

3    Service took the requisite hard look at the logging project's cumulative impacts in terms of

4    context or intensity.  See 40 C.F.R. § 1508.27(a), (b) (requiring consideration of both intensity to

5    determine the significance of impacts)

6         The Forest Service's cumulative impacts analysis depends largely on the internal Wildlife

7    BA, MIS Report, and Wildlife BE prepared for the Divide Auger Timber Sale, documents that

8    were never subjected to public review and comment.[4]  See infra at 28-31 (arguing that the Forest

9    Service failed to diligently provide for public involvement).  In total, the cumulative impacts

10   analysis with the EA and these underlying internal reports is conclusory, providing only

11   generalized statements of impacts, and omits an important influence contributing to cumulative

12   impacts – roads – and thus gives no assurance that the agency "provided the hard look it is

13   required to provide."  Neighbors of Cuddy Mountain, 137 F.3d at 1380.  However, the Forest

14   Service takes the position that:

15       Continued management in the areas listed above, combined with the Divide Auger
         Timber Sale, should not cause a significant drop of population levels for these
16       species across their range.  The majority of the watershed would continue to
         provide for late successional dependent species after implementation of this
17       project.  Current Forest management is directed to maintain dispersal between the
         LSRs and Wilderness', therefore, future timber sales should not affect the
18       dispersal of mid to late successional dependent species across their range.

19   AR 4481.  But this conclusion is unsupported by the record.  If anything, all the record shows is

20   that the Forest Service is subjecting Thomes Creek Watershed to "'the tyranny of small

21   _____

22        [4] The proper role of internal reports such as the Wildlife BA, MIS Report, and Wildlife BE is exemplified
     by the Forest Service's analysis of the Divide Auger Timber Sale's potential impacts to Tule Elk.  The MIS Report
23   provides a concise analysis of the impacts of the Divide Auger Timber Sale to Elk, concluding that the only Elk
     located on the Forest are located near Pillsbury Lake, that there have been no reported sightings of Elk, and
24   therefore, in part because of these facts, the "proposed project would not significantly affect this species ...." AR
     4458. See also e.g., AR 4451 (Acorn Woodpecker), 4453 (Black-Tailed Deer), 4458 (California Thrasher), 4459
25   (Pileated Woodpecker), and 4461 (Western Gray Squirrel).  The MIS Report satisfied the agency's NEPA duties by
     assisting the agency in identifying the issues of most importance.  This is contrasted to the above-mentioned analyses
26   for Northern Goshawk, American Marten, Pacific Fisher, and Northern Spotted Owl which are used, instead, to
     circumvent, inter alia, NEPA's "hard look" duty.

27   PLAINTIFF'S MTN. & MEM. FOR SUM. JUDG. AND INJ. REL.                    Page 11

1   decisions'" causing an unspecified level of cumulative habitat fragmentation.  Kern, 284 F.3d at

2   1078 (quoting Considering Cumulative Effects, at 1).

3        The MIS Report discloses that in the project area's southern units, past harvests in 1973,

4   1976, and 1988, left "small, isolated patches of suitable habitat," and logging in "units S1, T2, T4,

5   T5, S6, S7, and S9 would [further] reduce suitable habitat ...."  AR 4466.  According to the

6   Wildlife BA, MIS Report, and Wildlife BE, these sales involved the logging of 518 acres.  AR

7   4434, 4478, 4570.  In the northern units, the MIS Report states that logging within the project area

8   that occurred "in 1967 and 1988 ... caused some fragmentation" and that the proposed logging

9   "would fragment dispersal, [although] suitable habitat would still exist to allow protected

10  movement."  AR 4467.  According to the Wildlife BA, MIS Report, and Wildlife BE, these sales

11  involved the logging of 714 acres.  AR 4434, 4478, 4570.  Additionally, within 1.3 miles of the

12  northern units, logging sales totaling 236 acres occurred in 1968, 1982, 1996, and 1997.  Id.  What

13  is most revealing about these past sales is that "[i]t is unknown what silvicultural prescriptions

14  were utilized to harvest these sales."  Id.  The cumulative impacts analysis also lists three future

15  logging sales planned within the watershed.  One sale – Black Bear – is located 10 miles

16  southeast, another – Ball Mountain – is located four miles east, and the final sale – Foreman/Fish

17  – is located within one mile northeast of the southern portion of Divide Auger.  AR 4434-4435,

18  4478, 4570.  The Foreman-Fish logging sale is the most worrisome because it "could affect the

19  only avenue of dispersal available from the southern portion of Divide Auger."  AR 4478.  Little

20  information is available with regard to these sales' details except that, "[a]cres of harvest and

21  silvicultural treatments have not yet been determined ...."  AR 4478.

22       Based on these past and future logging sales, the MIS Report and Wildlife BE conclude

23  that "[t]he cumulative harvesting of the existing and proposed timber sales, within the watershed,

24  would cause additional fragmentation by reducing the amount of suitable nesting, denning, and

25

26

27

1   dispersal habitat, for the species dependent on mid to late successional habitat."[5]  AR 4478, 4570.

2   Eventually, "[m]ost of the matrix would be harvested, remain at a younger age due to harvesting

3   rotations, and would not provide late successional denning or nesting characteristics." AR 4479.[6]

4   Later, the MIS Report and Wildlife BE state that on private lands, "[o]nly small patches of timber

5   remain and would not be considered suitable mid to late successional species habitat" and that

6   "[i]t is highly probable that [the private logging companies] will continue to harvest on their lands

7   and that suitable late successional species nesting, denning, roosting, and dispersal habitat will not

8   exist except in areas restricted from harvest by state regulations."  AR 4481, 4572.[7]

9       In addition to federal and private logging, the Wildlife BA, MIS Report, and Wildlife BE

10  list several other influences on cumulative impacts – fire suppression, recreation, range, "other,"

11  tribal, state, and local – but these analyses are even more general and conclusory.  AR 4435-4437,

12  4479-4481, 4571-4573.  Perhaps the most egregious failure is the complete omission of any

13  assessment of the cumulative impacts caused by roads.

14      The sole extent of the analysis of roads consists of the following:

15      [m]aintenance would continue annually on Forest system roads and would be
        guided by the Programmatic Biological Assessment for Road Maintenance and
16      Repair (1998a) and its associated Addendum (1998b), and the Programmatic
        Biological Evaluation For Road Maintenance and Repair (2001a) and its
17      associated Addendum (2001b).[8]

18  AR 4480.  Notably, the Roads BA and BE are not the actual decision documents authorizing the

19

20      [5] The Wildlife BA concludes, similarly, that "cumulative harvesting ... would cause additional
21  fragmentation ... for the *northern spotted owl*."  AR 4435 (emphasis added).

22      [6] The Wildlife BA and BE contain similar language, stating "[m]ost of the matrix ... would not *reach
     nesting suitability*."  AR 4435, 4570.

23
        [7] The Wildlife BA states, similarly, that "[i]t is unlikely that the private land would become suitable in the
24  future due to intensive management practices."  AR 4437.

25      [8] This quote is factually incorrect.  Contrary to the statement, the cited 2001 addendum is not an addendum
     to the 2001 Road BE, but, rather, a second addendum to the 1998 Road BA.  See AR 3516.  This is not merely a
26  question of semantics: a BA assesses impacts to species listed as threatened or endangered pursuant to the ESA,
     while the BE assesses impacts to Forest Service "sensitive" species.

27  PLAINTIFF'S MTN. & MEM. FOR SUM. JUDG. AND INJ. REL.                    Page 13

1    road maintenance and improvement work.  Instead, such work is authorized pursuant to a decision

2    document signed on November 8, 1998.  SAR 0002.

3          Regardless, there is absolutely no discussion – whether in the EA, the Wildlife BA, MIS

4    Report, Wildlife BE, Roads BA, Roads BE, or roads decision document – of the influence of

5    existing roads within the project area and the broader watershed to cumulative late-successional

6    wildlife and wildlife habitat impacts.  Nor is there any discussion of the impacts caused by the

7    proposed road maintenance and improvements.  Notably, the Forest Service has developed new

8    road management policies "to provide a more ecological approach to analyzing existing and future

9    road needs."[9]  66 Fed. Reg. 3206 (January 12, 2001).  These policies were the result of a finding

10   that "[s]cientific evidence compiled to date suggests that roads ... are, in part, responsible for a

11   decline in the quality of fish and wildlife habitat."  Id. at 3208.

12         The LSR Assessment itself states that "[r]oad densities can affect habitat quality for many

13   species, including marten, fisher, nesting owls, goshawks, and other species.  Roads affect the

14   quality of late successional habitat by increasing erosion, exposing animals to predation, and

15   increasing noise disturbance."  AR 3376.  Specifically, for example, road densities are briefly

16   addressed by the BE's assessment of American Marten and Pacific Fisher, two "Sensitive

17   Species" that the Forest Service tracks "to determine whether proposed activities would result in a

18   trend toward [listing under the ESA]."  AR 4531.  The Wildlife BE states that "[c]urrent road

19   densities are approximately 5 miles per square mile, which falls under low quality habitat for

20   [marten and fisher].  Road densities at two miles or less, per square mile, is preferred for moderate

21   _____

22         [9] The intent behind the development of the roads policies was to:

23         (1) Develop new analytical tools to decide if, and when, new and existing roads are needed to meet
           resource management objectives; (2) aggressively decommission roads that are determined,

24         through forest planning, implementation of [NEPA], and other analyses, to be damaging to the
           environment or to be no longer necessary for achieving resource management objectives; and (3)

25         maintain and improve those important roads that do not compromise healthy lands and waters and
           are needed for recreation, rural access, and the sustainable flow of goods and services.

26   66 Fed. Reg. 3206-07.

27   PLAINTIFF'S MTN. & MEM. FOR SUM. JUDG. AND INJ. REL.                    Page  14

1    to high quality habitat."  AR 4547, 4550.

2        In total, these troubling statements provide no quantitative detail of the significance – i.e.,

3    the context and intensity – of the cumulative fragmentation to late successional wildlife and

4    wildlife habitat and thus do not constitute the requisite hard look.  See 40 C.F.R. § 1508.27(a), (b)

5    (obligating federal agencies, in determining the significance of impacts, to consider both context

6    and intensity).  Specifically, the record fails to assess or identify whether fragmentation would

7    occur in particularly sensitive locations relative to the broader Thomes Creek Watershed and the

8    broader landscape, how such fragmentation would affect terrestrial and airborne vertebrate

9    species, whether such impacts would differ between species, the specific role of the Divide Auger

10   Timber Sale in contributing to that fragmentation, the interrelationship between each activity or

11   influence relevant to cumulative impacts, and whether there are mitigation measures and

12   management opportunities that could be implemented to reduce impacts to acceptable levels.

13       This "tyranny of small decisions" – and the concomitant failure of the agency to detail

14   their cumulative impacts – is of considerable concern given that the project area, the headwaters

15   of Thomes Creek, constitutes an ecological and biological link between the Yolla Bolly – Middle

16   Eel Wilderness and the Buttermilk LSR.  AR 3409 (stating that connectivity within the Buttermilk

17   LSR is provided, in large part, by the headwaters of Thomes Creek), 4479 ("Critical areas to

18   maintain adequate dispersal habitat in the future would be between LSR RC 309 and the Yolla

19   Bolly Wilderness").  Even though the Buttermilk LSR is allegedly "fully functional," LSRs, both

20   the large LSRs such as the Buttermilk and the smaller 100 acre LSRs surrounding Activity

21   Centers ("ACs"), function not as "islands," but rather, and critically, as a cohesive, linked

22   "network."  AR 3351; see also AR 3449 ("100-acre LSRs represent a network of stands of

23   existing late successional habitat that are to be retained in their natural condition with natural

24   processes, such as fire, allowed to function to the extent possible").  Indeed, the definition of a

25   "fully functional" LSR is one that "contain[s] well connected late successional habitat, *and* [is]

26   connected to other LSRs through dispersal habitat for both aerial and ground traversing species."

27

1    AR 3360 (emphasis added).  This is because the "*distribution and connectivity* of late

2    successional habitat" – not merely its *presence* – "affects species' ability to disperse and maintain

3    healthy and viable populations."  AR 3380 (emphasis added).  In fact, one of the goals within the

4    Thomes Creek Watershed is to "[m]aintain adequate amount *and distribution* of habitat for

5    [threatened and endangered] wildlife species."  AR 2713 (emphasis added).

6         Thus, impacts to the matrix within the Divide Auger project area may cumulatively impact

7    the functionality of the Buttermilk LSR.  The Buttermilk LSR, as the largest LSR in the

8    Mendocino National Forest, "is a crucial link between the Yolla Bolly – Middle Eel Wilderness to

9    the north, LSR RC 310 (Grizzly) to the southwest, and RC 311 (Refuge) to the south."  AR 3407.

10   As stated by the Forest Service, the Buttermilk LSR, and the associated Grizzly LSR, "are the

11   most important LSRs found on the Forest in terms of maintaining healthy, mobile populations of

12   late successional habitat dependent species in the Mendocino National Forest" and the Buttermilk

13   LSR, specifically, provides "a late successional habitat link between [the Grizzly LSR], RC 311

14   and the Yolla Bolly – Middle Eel Wilderness."  AR 3411.

15        The Ninth Circuit addressed habitat connectivity in Marble Mountain Audubon Society v.

16   Rice, 914 F.2d 179 (9th Cir. 1990).  In Marble Mountain, a Forest Service Timber Sale EIS failed

17   to address the importance of maintaining biological corridors between the Red Buttes Wilderness

18   and the Grider Creek drainage in the Klamath National Forest of northern California and southern

19   Oregon.  914 F.2d at 182.  As the Court explained:

20        Biological corridors provide avenues along which wide-ranging animals can
         travel, plants can propagate, genetic interchange can occur, populations can move
21       in response to environmental changes and natural disasters, and threatened species
         can be replenished from other areas.
22

23   Id. at 180 n.2.  The Court held the Forest Service had failed to take the requisite "hard look,"

24   finding in a situation analogous to the facts here, that "[a]lthough the FEIS acknowledges that the

     Grider drainage is a biological corridor, it does not contain a significant discussion of the corridor
25
     issue."  Id. at 182.  Here, the Forest Service must assess the cumulative impact to habitat
26

27   PLAINTIFF'S MTN. & MEM. FOR SUM. JUDG. AND INJ. REL.                    Page  16

1  connectivity caused by the Divide Auger Timber Sale.  See also Pacific Coast Federation of

2  Fishermen's Ass'ns v. National Marine Fisheries Service, 265 F.3d 1028, 1035-1037 (9th Cir.

3  2001) (holding that agency must assess aggregate effect of 128 acre project representing only 1%

4  to 0.1% of the watershed because "[w]ithout aggregation, the large spatial scale appears to be

5  calculated to ignore the effects of individual sites and projects" and, therefore, "if in fact [the

6  agency] disregards the effects of individual projects as 'localized' when they can have significant

7  aggregate effects, it acts arbitrarily and capriciously").

8          At bottom, the Forest Service failed to take the requisite hard look at cumulative impacts

9  to late successional wildlife and wildlife habitat and the landscape's broader ecological and

10  biological connectivity.  Therefore, the Divide Auger Timber Sale is unlawful.

11  **B.  The Forest Service Failed to Supply a Convincing Statement of Reasons Justifying a Finding of No Significant Impact**

12       **1. The Forest Service's Duty to Justify a FONSI**

13          The Forest Service failed to supply a convincing statement of reasons justifying the

14  FONSI.  The Forest Service, in its FONSI for the Divide Auger, concludes that an EIS is

15  unnecessary because, in part, there "are no apparent adverse cumulative or secondary effects ...

16  [t]here will be no adverse impact to any sensitive, threatened, or endangered plant or animal

17  species ... [and] [t]here will be no significant adverse effects ...."  AR 4591-4592; see also AR

18  4641-4648 (EA discussion of effects relative to significance factors).

19          This justification, however, is flawed because, as discussed above, the Forest Service

20  failed to take a hard look at the cumulative impacts of the Divide Auger Timber Sale to late

21  successional wildlife and wildlife habitat and thus has not demonstrated that there "are no

22  apparent adverse cumulative or secondary effects."  Id.; See supra at 10-17.  Two other reasons

23  further undermine the Forest Service's FONSI.  First, the agency has conflated its substantive

24  and procedural obligations, and, in the process, not complied with its NEPA duties.  Second, and

25  relatedly, the weight of the record strongly suggests that the Forest Service needs to prepare a full

26

27

1    EIS because the record does not support a FONSI.

2          NEPA requires a full EIS for any major federal action that *may* significantly affect the

3    environment.  42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.3.   As recognized by the 9th Circuit:

4          We have held that an EIS *must* be prepared if 'substantial questions are
      raised as to whether a project ... *may* cause significant degradation to some
5          human environmental factor.'  To trigger this requirement a 'plaintiff need
      not show that significant effects *will in fact occur*,' raising 'substantial
6          questions whether a project may have a significant effect' is sufficient.

7    Idaho Sporting Congress v. Thomas, 137 F.3d at 1149-1150 (citations omitted) (emphasis

8    in original).  An agency, if it decides not to prepare a full EIS, and instead proceeds with an

9    action based solely on an EA and FONSI, "must supply a 'convincing statement of reasons' to

10   explain why a project's impacts are insignificant."  Blue Mountains Biodiversity Project, 161

11   F.3d at 1211 (citations omitted).

12         Significance, for purposes of NEPA, is determined by looking at both the "context" and

13   "intensity" of the proposed action.  See 40 C.F.R. § 1508.27(a) (context), (b) (intensity).  In

14   assessing "context," the Forest Service is required to look at different geographic scales and the

15   short- and long-term impacts of the proposed action within those different geographic scales.  40

16   C.F.R. § 1508.27(a).  In assessing "intensity," the Forest Service must look at the severity of the

17   impact based on ten factors.  40 C.F.R. § 1508.27(b).  "If [the agency's] action is

18   environmentally 'significant' according to *any* of these criteria, then [the agency] erred in failing

19   to prepare an EIS."  Public Citizen v. Department of Transportation, 316 F.3d 1002, 1023 (9th

20   Cir. 2003) (emphasis in original) (citing National Parks and Conservation Assn., 241 F.3d at 731.

21         **2. The Forest Service's Conflation of Substantive and Procedural Duties**

22         The FONSI's conclusion that impacts to wildlife and wildlife habitat will be insignificant

23   is predicated, in part, on the EA which concludes that "no significant effects to wildlife species

24   would result from the proposed activities within the Divide Auger area and therefore, were not

25   specifically addressed under the Divide Auger EA."  AR 4664.  To justify this conclusion, the

26   Forest Service essentially asserts that it has complied with the NFMA's and the Forest Plan's

27   PLAINTIFF'S MTN. & MEM. FOR SUM. JUDG. AND INJ. REL.                    Page 18

1    substantive provisions for late successional wildlife and wildlife habitat – by, e.g., protecting

2    LSRs, riparian reserves, retaining 15% of the overstory trees within each logging stand, ensuring

3    viability, and, in the context of threatened and endangered species, obtaining a "no jeopardy"

4    determination from the Fish and Wildlife Service  – and that because these provisions have been

5    satisfied there are "no significant effects."[10]  See e.g., AR 4646, 4648, 4656, & 4664.

6         This justification is simply wrong.  Even if the agency has fully complied with its

7    substantive duties, although it has not (see at 31-39 (asserting that agency has not complied with

8    its duty to ensure species diversity and viability)), this does not render environmental impacts –

9    in particular cumulative impacts – "insignificant" and does not absolve the agency from its

10   NEPA duties.  The courts have previously stated that compliance with one set of legal duties is

11   not a substitute for compliance with other legal duties.  Seattle Audubon Society v. Evans, 771 F.

12   Supp. 1081, 1093 (W. D. Wash. 1994), aff'd, 952 F.2d 297 (9th Cir. 1991) (noting that "[a]

13   review of proposed sales by the FWS would not be a substitute for compliance with NFMA");

14   Portland Audubon Society v. Lujan, 795 F.Supp. 1489, 1509 (D. Or. 1992) (rejecting agency's

15   request for the court to "accept that its consultation with the United States Fish and Wildlife

16   Service under the [ESA] constitutes a substitute for compliance with NEPA"); National Wildlife

17   Federation v. Babbitt, 128 F. Supp. 2d 1274, 1302 (E.D. Cal. 2000) (requiring EIS under NEPA

18   even though mitigation plan satisfied ESA) (citations omitted).

19        This is particularly so in this case because the substantive thresholds established by

20   NFMA and the Forest Plan are much higher than the "may have a significant effect" standard

21   established for NEPA's significance threshold.  Moreover, NEPA's procedural duties are

22   different.  The Forest Service's substantive duties are designed to achieve specific goals and

23   objectives such as protecting a specified acreage of wildlife habitat.  The Forest Service's

24

25        [10] In the specific context of the Northern Spotted Owl, the Wildlife BA, MIS Report, and Wildlife BE, each
26   of which contain nearly identical cumulative impacts sections, specify that Northern Spotted Owl "matrix Activity
     Centers" were unnecessary to support the LSRs and would not affect species viability.  AR 4435, 4479, 4571.

27   PLAINTIFF'S MTN. & MEM. FOR SUM. JUDG. AND INJ. REL.                              Page 19

1    procedural duties under NEPA, conversely, are designed to ensure that the agency "consider[s]

2    every significant aspect of the environmental impact of a proposed action" and to "inform the

3    public that it has indeed considered environmental concerns in its decisionmaking process."

4    Kern, 284 F.3d at 1066 (citation and quotation marks omitted).

5            In an analogous situation, the District Court for the District of Hawaii held that an

6    agency's compliance with the ESA did not absolve the agency from its duty to prepare an EIS:

7           The Army argues that its FONSI is also largely based on the results of the consultation
            with FWS that is required by the ESA. The Army asserts that its conclusion that live-fire
8           training will have no significant impact on endangered species in Makua Valley is
            supported by FWS's finding that the proposed action is not likely to jeopardize the
9           endangered species in Makua Valley.  See Friends of [the] Payette v. [Horseshoe Bend
            Hydroelectric Co.], 988 F.2d [989] at 994-95 [9th Cir. 1993] (finding that FWS's approval
10          of a proposed action is one factor in determining whether the proposed action will have
            an impact on endangered species).  *The Army admits that the "no jeopardy" opinion by*
11          *FWS under the ESA is not equivalent to a finding of no potential impact under NEPA.*
            *The "no jeopardy" opinion says that routine training would not likely jeopardize the*
12          *continued existence of endangered species, provided certain safeguards are implemented.*
            *A FONSI, by contrast, must be based on a review of the potential for significant impact,*
13          *including impact short of extinction.  Clearly, there can be a significant impact on a*
            *species even if its existence is not jeopardized.*
14
     Makua v. Rumsfeld, 163 F.Supp.2d 1202, 1218 (D. Ha. 2001) (emphasis added).  Consequently,
15
     the agency has unlawfully conflated its substantive and procedural duties, thus rendering the
16
     FONSI unlawful.
17
         **3.  The Forest Service's Failure to Justify the FONSI**
18
             The fact that the Forest Service has conflated its substantive and procedural duties fatally
19
     undermines the agency's assertion that the Divide Auger Timber Sale will have "insignificant
20
     impacts" and any assertion that the Forest Service has taken the requisite hard look at the
21
     cumulative impacts of the Divide Auger Timber Sale to late successional wildlife and wildlife
22
     habitat sufficient to justify the FONSI.  See AR 4586 (FONSI).  Indeed, rather than causing
23
     insignificant impacts, the Divide Auger Timber Sale raises substantial questions that the logging
24
     may cause significant degradation to the environment.  See Idaho Sporting Congress v. Thomas,
25
     137 F.3d at 1149-50 (stating that "significance" triggered when "substantial questions are raised
26

27

1   as to whether a project ... *may* cause significant degradation ... and that 'plaintiff need not show

2   that significant effects *will in fact occur*'" (emphasis added)).  At this juncture, the FONSI is not

3   supported by the administrative record and therefore the Divide Auger Timber Sale should be

4   vacated until NEPA is fully complied with.

5       There are two glaring failures in the Divide Auger EA in terms of significance.  First, the

6   Divide Auger Timber Sale threatens to violate federal law – specifically, the Forest Service's

7   duty under NFMA to ensure the diversity and viability of species.  Sierra Club v. U.S. Forest

8   Service, 843 F.2d 1190, 1195 (9th Cir. 1988) (agency's failure to comply with the Clean Water

9   Act rendered EA unlawful and necessitated preparation of an EIS); 40 C.F.R. § 1508.27(b)(10);

10  see infra at 31-39 (asserting violations of NFMA diversity and viability duties).  Second, the

11  agency has failed to adequately account for the "[u]nique characteristics of the geographic area"

12  and, relatedly, failed to take the requisite hard look at cumulative impacts to the geographic area.

13  40 C.F.R. §§ 1508.27(b)(3) (requiring that to determine significance, an agency must consider

14  unique geographic circumstances), 1508.27(b)(4) (requiring that to determine significance, an

15  agency must consider "cumulatively significant impacts").

16      The headwaters of Thomes Creek, where the Divide Auger Timber Sale will take place, is

17  nestled between the Yolla Bolly – Middle Eel Wilderness and the Buttermilk LSR.  The

18  ecological and biological value of the ancient forests in the Divide Auger project area is, in large

19  part, predicated on the fact that they provide key ecological and biological connectivity between

20  the Wilderness and the LSR.  AR 3409, 4479; see also supra at 15-17.  The Buttermilk LSR, as

21  the largest, and, in conjunction with the Grizzly LSR, the most important LSR in the Mendocino

22  National Forest, provides crucial dispersal habitat for late-successional dependent species from

23  the Grizzly LSR, through the Buttermilk LSR, and into the Yolla Bolly – Middle Eel Wilderness.

24  In other words, the Buttermilk LSR does not function as an island.  Rather, the Buttermilk LSR

25  functions as part of a network of geographically distributed large LSRs bound together by and

26  dependent on the presence and proper distribution of late successional dispersal habitat within

27

1  the matrix lands.  AR 3351, 3360.  Consequently, the Divide Auger project area is of unique and

2  critical geographic importance.

3      Yet, the Divide Auger Timber Sale threatens this key late-successional habitat link.  See

4  supra at 10-17.  This conclusion is most pronounced in the context of the Northern Spotted Owl,

5  a species listed as threatened in 1990 pursuant to the ESA.  Def. Answer ¶ 36.  Northern Spotted

6  Owls rely on two types of habitat: nesting and roosting habitat, and foraging and dispersal

7  habitat.[11]  The Fish and Wildlife Service recommends 1336 acres of nesting, denning, forage, and

8  dispersal habitat to support each Northern Spotted Owl nesting pair within the Northern Spotted

9  Owl's home range.  AR 4467.  Within the project area/analysis area there are 4 Northern Spotted

10  Owl ACs, associated 100-acre LSRs, and 1.3 mile radius "homeranges" centered on each AC.[12]

11  AR 4421-4422, 4425-4427.

12      The Divide Auger Timber Sale will eliminate 5 acres of suitable nesting and roosting

13  habitat and 154 acres of suitable foraging and dispersal habitat that "would reduce suitable

14  habitat within three home ranges."  AR 4470.  Notably, before commercial logging even takes

15  place, two of the home ranges already contain "less than half the recommended acreage to

16  support a nesting pair of owls."  Id.  Specifically, the homerange centered on AC 1001 "currently

17  consists of only 16 percent suitable habitat," and the homerange centered on AC 1008 "currently

18  consists of only 25 percent suitable habitat."  AR 4511.  Subsequent to the logging, only "[o]ne

19  home range [1052] would remain above the recommended level of "40% (1336 acres) or more of

20  suitable nesting, roosting, ... foraging [and dispersal] habitat within the [1.3 mile] provincial

21

22  _____

23      [11] Nesting and roosting habitat consists of live trees 21 inches diameter base height or greater with a
minimum of 60% canopy closure in timber strata M4G and M6G with an understory demonstrating "multi-layered,

24  uneven-aged conifer and hardwoods."  AR 4423.  Foraging and dispersal habitat consists of nesting and roosting
habitat and M3G, M4P, R4X, and C4X (C4P & C4G) with a minimum of 40% canopy closure.  AR 4423; see also

25  AR 4442 (explaining timber strata).

26      [12] These homeranges, and their associated ACs, and 100 acre LSRs, are numbered 1001, 1008, 1030, and
1052.  AR 4425-4426.

27

radius."[13]  AR 4425, 4470.  "The loss of nesting and foraging habitat could limit the availability of nesting sites, cause further fragmentation within the analysis area, and reduce the availability of dispersal habitat for juvenile owls.  Fragmentation would increase the probabilities of predation on spotted owls."  AR 4425 (citation omitted).

Based on these facts, the Wildlife BA concludes that there could be both "direct" and "indirect" effects to the Northern Spotted Owl and therefore the Divide Auger Timber Sale "may adversely affect habitat for the [Northern Spotted Owl]."  AR 4429, 4437.  This "may affect" determination triggered the Forest Service's obligation to formally consult with the Fish and Wildlife Service pursuant to section 7 of the ESA.  As stated by the Forest Service in its formal Biological Opinion:

> The proposed prescriptions will significantly alter the stand structure and forest microclimate to the point that remaining vegetation will neither provide appropriate nest and roost sites nor the sufficient thermal cover necessary to protect spotted owls from temperature extremes.  Following timber harvest, these stands may remain unsuitable for approximately 40-50 years before regeneration stands develop the size and structure to provide potential foraging and dispersal habitat for spotted owls, and for at least 80-100 years for replacement of structural conditions characteristic of nesting/roosting habitat.

AR 4511.  The Biological Opinion states further that in the specific context of AC 1001, currently limited to 16% suitable habitat, there will be a loss of 59 acres, and "such loss of habitat, particularly within 0.7 miles of an activity center, will exacerbate already poor habitat conditions within this home range, to the point of impairing successful spotted owl reproduction and survival."  AR 4511.  Similarly, for AC 1008, currently limited to 25% suitable habitat, the FWS comes to an identical conclusion.  AR 4511-4512.  The Fish and Wildlife Service eventually concludes that impacts to the Northern Spotted Owl "would not likely jeopardize the continued existence of the northern spotted owl."  AR 4513.

But, as discussed above, simply because the agency has complied with the ESA does not

---

[13] Thus, subsequent to logging, only Homerange 1052 would meet the recommended 40% (1336 acres) nesting, roosting, and foraging habitat.  AR 4426.

1  absolve the agency of its duties to take a hard look at environmental impacts and to supply a

2  convincing statement of reasons for why a proposed action will not significantly impact the

3  environment.  This is because cumulative impacts analyses conducted by the Fish and Wildlife

4  Service pursuant to the ESA are designed to determine whether a given activity would jeopardize

5  the existence of a listed species or result in the destruction or adverse modification of its critical

6  habitat, and are therefore, by definition extremely broad in scope, but narrowly targeted in

7  purpose.  50 C.F.R. § 402.01; U.S. Fish and Wildlife Service & National Marine Fisheries

8  Service, Endangered Species Consultation Handbook, Procedures for Conducting Consultation

9  and Conference Activities Under Section Seven of the Endangered Species Act at 4-30 to 4-

10  31(March 1998).  They do not, however, function as a substitute for project-level cumulative

11  impacts analyses required by NEPA.  In other words, the cumulative impacts of a given project –

12  like the Divide Auger Timber Sale – may not lead to a conclusion that a listed species would be

13  *jeopardized*, but, nonetheless, those impacts, for purposes of NEPA, may very well – as here – be

14  *significant* and thus require the preparation of an EIS.

15      To determine significance, the Forest Service must account for the context of the

16  proposed action – here, a small, but vital parcel of ancient forests that links broader, landscape

17  scale habitat for species dependent on late-successional habitat.  Additionally, within that

18  context, the agency must account for the intensity of the impacts caused by the proposed action –

19  here, a commercial logging project that may compromise the diversity and viability of late

20  successional wildlife, compromise the functionality of a unique and key link within the

21  Mendocino National Forest's interconnected network of LSRs and other protected late

22  successional lands, and cause significant cumulative impacts.[14]  Due to the agency's failure to

23

24      [14] The Forest Service incorrectly asserts that "when the LSRs were fully functional, matrix Activity Centers
were not required to support the LSRs and effects to them would not affect the viability of the species across its

25  range.  [The Buttermilk LSR] is considered to sufficiently provide for owls."  AR 4470.  As discussed above, Matrix
ACs support the species as a whole through a network of linked late-successional habitat.  See supra at 15-16.  Thus,

26  the Matrix ACs cannot be so easily dismissed, and, indeed, are critical to the Buttermilk LSR's functionality.

27  PLAINTIFF'S MTN. & MEM. FOR SUM. JUDG. AND INJ. REL.                    Page 24

1  account for these facts, and the agency's dismissive characterization of impacts as

2  "insignificant," the agency has not supplied a convincing statement of reasons justifying the

3  FONSI and thus the Divide Auger Timber Sale is unlawful.

4  **C.  The Forest Service Failed to Consider a Reasonable Range of Alternatives**

5  **1. The Forest Service's Obligation to Consider a Reasonable Range of Alternatives**

6  The Forest Service's range of alternatives is flawed because the agency failed to consider

7  a noncommercial, restoration based alternative that relied on understory thinning of small

8  diameter trees to respond to insect and disease concerns and high fuel loads and fire risk.

9  Fundamentally, just because this area is matrix land, and just because much of the landscape has

10  already been altered to the point that it provides only limited and fragmented suitable pockets of

11  habitat, the agency should not automatically consider only commercial logging alternatives.

12  Indeed, the fact that the area has been altered should suggest the need to consider a

13  noncommercial, restoration based alternative.  Such an alternative could protect late successional

14  wildlife and wildlife habitat – in particular habitat connectivity between the Buttermilk LSR and

15  Yolla Bolly – Middle Eel Wilderness – and thus allow commercial logging to proceed in other

16  areas without causing unacceptable impacts.

17  Alternatives are the "heart" of the NEPA process.  40 C.F.R. § 1502.14.  NEPA obligates

18  federal agencies to "study, develop, and describe appropriate alternatives to recommended

19  courses of action in any proposal which involves unresolved conflicts concerning alternative uses

20  of available resources."  42 U.S.C. § 4332(E); see also § 4332(2)(C)(iii).  NEPA's implementing

21  regulations state further that federal agencies must "'[r]igorously explore and objectively

22  evaluate all reasonable alternatives to a proposed action' so that the agency can 'sharply defin[e]

23  the issues and provid[e] a clear basis for choice among options by the decisionmaker and the

24  public.'"  Kootenai Tribe of Idaho v. Veneman, 313 F.3d 1094, 1120 (9th Cir. 2002) (quoting 40

25  C.F.R. § 1502.14).  Notably, the agency's duty to consider alternatives "is both independent of,

26  and broader than," its duty to complete an environmental analysis.  Bob Marshall Alliance v.

27

1   Hodel, 852 F.2d 1223, 1229 (9th Cir. 1988).

2       In considering a reasonable range of alternatives, "[t]he stated goal of a project

3   necessarily dictates the range of 'reasonable' alternatives and an agency cannot define its

4   objectives in unreasonably narrow terms." City of Carmel-By-The-Sea, 123 F.3d at 1155.

5   Ensuring that the agency does not unreasonably constrain its choices by identifying narrow

6   objectives – i.e., the purpose and need – before actually developing and analyzing alternatives is

7   particularly critical given that "[NEPA] sets forth procedural mechanisms to ensure proper

8   consideration of environmental concerns, it does not mandate particular substantive results." Id.

9   at 1150 (citing Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council,

10  Inc., 435 U.S. 519, 558 (1978)).  This is reinforced by the requirement that NEPA's procedures

11  are to be "strictly interpreted 'to the fullest extent possible' in accord with the policies embodied

12  in the Act ...."  Center for Biological Diversity, 349 F.3d at 1166 (citations omitted).

13      **2. The Forest Service's Unreasonable Range of Alternatives**

14      The Divide Auger EA, in addition to its "no action" alternative, considered two action

15  alternatives.  Each of these alternatives involved commercial logging.  AR 4601 (Alternative B),

16  4604 (Alternative C).  The Forest Service never considered a completely noncommercial,

17  restoration based alternative.  Effectively, the agency's consideration of action alternatives has

18  resulted in a situation where the decision – commercial logging – was preordained.  In so doing,

19  the agency narrowed its analysis to the point that it did not "'sharply define the issues'" and did

20  not provide itself, or the public, with a "'clear basis for choice.'" Kootenai Tribe of Idaho, 313

21  F.3d at 1120 (quoting 40 C.F.R. § 1502.14).

22      By adamantly refusing to consider a noncommercial, restoration based alternative, the

23  Forest Service has tied its hands.  The agency justifies its refusal by stating:

24      The first purpose and need is to "Provide an adequate supply of timber supply that
        contributes to the economic stability of rural community by generating economic
25      activity, income and employment."  An alternative where small diameter trees are
        removed fails to meet this purpose and need for action.

26

27

1    AR 4654.  This justification, however, has two major flaws.

2          First, agencies may not decline to evaluate an alternative simply on the grounds that it is

3    not a "complete solution" to the agency's goals.  Natural Resources Defense Council v. Morton,

4    458 F.2d 827, 836 (D.C. Cir. 1972) (agency should not "disregard alternatives merely because

5    they do not offer a complete solution to the problem"); Citizens Against Toxic Sprays v.

6    Bergland, 428 F. Supp. 908, 933 (D. Or. 1977) (same).  Agencies may only reject an alternative if

7    it is "unreasonable" – i.e., either remote or speculative, or infeasible or impractical – and here,

8    the record does not demonstrate, beyond the claim that it would not provide commercial timber,

9    that a noncommercial, restoration based is remote, speculative, infeasible, *or* impractical.  See

10   Muckleshoot Indian Tribe v. U.S. Forest Service, 177 F.3d 800, 814 (9th Cir. 1999) (citations

11   omitted) (agency need not consider alternatives that are "remote and speculative"); Forty Most

12   Asked Questions Concerning CEQ's NEPA Regulations, 48 Fed. Reg. 18,026 (March 16, 1981)

13   ("[i]n determining the scope of alternatives to be considered, the emphasis is on what is

14   'reasonable' rather than on whether the proponent or applicant likes or is itself capable of

15   carrying out the particular alternative.  Reasonable alternatives include those that are practical or

16   feasible from a technical and economic standpoint and using common sense, rather than simply

17   desirable from the standpoint of the applicant").  Thus, the Forest Service's fixation on providing

18   commercial timber and consequent failure to consider a noncommercial, restoration based

19   alternative is fatal to the validity of the Divide Auger EA.  See, e.g., Idaho Conservation League

20   v. Mumma, 956 F.2d 1508, 1519-20 (9th Cir. 1992) ("[t]he existence of a viable, but unexamined

21   alternative renders an environmental impact statement inadequate" (quoting Citizens for a Better

22   Henderson v. Hodel, 758 F.2d 1051, 1057 (9th Cir. 1985)).

23         Second, the agency has inconsistently applied its logic – albeit incorrect logic – that

24   because a given alternative does not meet every single purpose and need, then it need not be

25   considered during the NEPA process.  Both action alternatives include commercial logging in the

26   southern units.  However, "[i]nsects and disease within the southern Divide Auger units is

27

1    minimal." AR 4634.  Thus, the commercial logging of the southern units would not meet the

2    goal of the project to minimize the spread of insect and disease pathogens.  AR 4595.  The

3    agency states that the reason commercial logging of the southern units was included in

4    Alternative B was  "to address the first purpose and need to supply an adequate, cost efficient

5    timber supply to the local community."  AR 4654.  Therefore, while the agency finds itself fit to

6    reject a noncommercial, restoration based alternative because it does not satisfy one of four

7    factors of its purpose and need, this single factor alone is apparently sufficient to justify the

8    commercial logging of the southern units in Alternative B.

9         The agency's actions – and inconsistent use of the EA's purpose and need to identify and

10    select a reasonable range of alternatives – leads to the inescapable conclusion that the alleged

11    concerns about insects and disease and fuels and fire risk are merely opportunistic means to an

12    end – commercial logging of late successional ancient forests.  The agency's desire to

13    commercially log the Divide Auger, however it may comport with the agency's discretion to

14    determine how matrix lands are ultimately managed, does not obviate the agency's duty to

15    consider a noncommercial, restoration based alternative.  For these reasons, the Divide Auger

16    Timber Sale is unlawful.

17    **D. The Forest Service's Failure to Diligently Involve the Public**

18         The Forest Service failed to comply with its duty to diligently involve the public in the

19    preparation of the Divide Auger EA.  The CEQ regulations implementing NEPA require the

20    Forest Service to "[m]ake diligent efforts to involve the public in preparing and implementing

21    their NEPA procedures" and to "[e]ncourage and facilitate public involvement."  40 C.F.R. §§

22    1500.2(d), 1506.6(a).  The public cannot provide informed input if the agency selectively

23    provides information, and postures – as here – a decision in a light designed to avoid scrutiny.

24         The Ninth Circuit generally finds an EA sufficient so long as the agency takes a "hard

25    look at the issues and responds to reasonable opposing viewpoints."  Earth Island Institute, 351

26    F.3d at 1301  (citing 40 C.F.R. §§ 1502.9(a), (b)).  As part of this duty, the Forest Service must

27

1    ensure that "the public receive the underlying environmental data from which a Forest Service

2    expert derived her opinion."  Idaho Sporting Congress v. Thomas, 137 F.3d at 1150.  The Forest

3    Service "must also 'identify any methodologies used' and 'make explicit reference by footnote to

4    the scientific and other sources relied upon for conclusions in the [EA]."  Earth Island Institute,

5    351 F.3d at 1301 (quoting 40 C.F.R. § 1502.24); See also Sierra Club v. Bosworth, 199

6    F.Supp.2d at 980.

7          However, an agency cannot blithely rely on evidence in the administrative record that is

8    not openly and publicly assessed within the NEPA document itself simply because the NEPA

9    document cites the evidence.  See Robertson v. Methow Valley Citizens, 490 U.S. 332, 349

10   (1989) (NEPA "guarantees that the relevant information will be made available to the larger

11   audience that may also play a role in both the decisionmaking process and the implementation of

12   that decision").  As stated by the Ninth Circuit, "we have not established a minimum level of

13   public comment and participation ... governing the EA and FONSI process ...."  Citizens for

14   Better Forestry v. U.S. Department of Agriculture, 341 F.3d 961, 970 (9th Cir. 2003).  Therefore,

15   whether the agency has actually provided for diligent public participation depends on the nature

16   of the decision being considered.

17         Here, the fact that the Divide Auger EA gives impacts related to three critical issue areas

18   "second class" status – wildlife and wildlife habitat, fuels and fire risk, and roads – demonstrates

19   that the agency has not adequately provided for public participation.[15]  For these three issue areas,

20   the Forest Service buried its analysis within internal specialist reports, some of which – those

21   pertaining to roads – were not even developed as part of the Divide Auger Timber Sale.  For

22   wildlife and wildlife habitat, the Forest Service completed three reports: the Wildlife BA, MIS

23   _____

24         [15] The EA itself does summarize impacts related to wildlife and wildlife habitat and fuels and fire risk in
     two locations.  First, within the EA's rationale for why these issues are not cumulatively significant.  AR 4645 (fuels

25   and fire risk), 4646 (wildlife and wildlife habitat).  And, second, in the Forest Service's response to public
     comments.  AR 4655, 4669-4670 (fuels and fire risk), 4655, 4663-4664, 4668, 4672 (wildlife and wildlife habitat).

26   These sections, however, are entirely conclusory.  The "meat and potatoes" of the analysis is, as stated, relegated to
     specialist reports never subjected to public review or comment.

27   PLAINTIFF'S MTN. & MEM. FOR SUM. JUDG. AND INJ. REL.                          Page  29

1   Report, and Wildlife BE.  For fuels and fire risk, the Forest Service completed the Divide Auger

2   Fuels Analysis.  For roads, the Forest Service relies on the 1998 Road BA, its two addendums,

3   and the 2001 Road BE.  Each of these issues, however, are of critical concern and should have

4   been considered as potentially significant and thus specifically addressed by the EA.  See supra at

5   20-25 (arguing that Forest Service failed to supply a convincing statement of reasons why

6   impacts were insignificant).

7        However, the public was never afforded the opportunity to review and comment on these

8   analyses.  While these analyses were eventually made available, EPIC only received these

9   analyses after submitting formal Freedom of Information Act ("FOIA") requests.  See AR 3984

10   (EPIC FOIA request of 4/10/02), 4002 (EPIC FOIA request of 5/22/02), and 4390 (EPIC FOIA

11   request of 12/5/2002).  Given that the 30-day review and comment period provided for the

12   revised draft Divide Auger EA was initiated on November 6, 2002, and given that EPIC, because

13   of the timing of its FOIA request (December 5, 2002, AR 4390), and the normal 20-day FOIA

14   response time (5 U.S.C. § 552(a)(6)(A)(i)), did not receive a response to its request for several of

15   these internal agency analyses until December 20, 2002 (AR 4392), and, indeed, several of these

16   analyses were not yet available (AR 4392), EPIC, let alone the public, was never able to

17   effectively participate in the Divide Auger NEPA process.[16]

18        The Forest Service's obligation to consider these issues in the body of the EA – and to

19   thereby subject its analysis to public review and comment – is important for two reasons.  First,

20   by dismissing these issues as insignificant, and burying analyses in specialist reports, it was far

21   easier for the Forest Service to disregard the public's concerns and to drown the public with

22

23        [16] Notably, the wildlife specialist reports were finalized *after* the Forest Service requested comments on the draft Divide Auger EA on November 6, 2002.  AR at 4314.  For example, the Biological Assessment for wildlife was

24   not completed until March 25, 2003.  AR at 4411.  The Wildlife Specialist's Report – which constitutes the Forest Service's MIS report for the Divide Auger Timber Sale – was not completed until April 3, 2003.  AR at 4447.  The

25   Biological Evaluation for wildlife was not completed until June 6, 2003 – the same exact day the DN/FONSI was signed.  AR at 4530.  Additionally, the Fish and Wildlife Service's Biological Opinion was not completed until June

26   4, 2003.  AR at 4489.  In effect, the Forest Service deemed wildlife issues insignificant and thus not deserving of detailed analysis within the EA before its own specialists had the opportunity to weigh in with their final results.

27   PLAINTIFF'S MTN. & MEM. FOR SUM. JUDG. AND INJ. REL.        **Page  30**

1    conclusory responses to comments that cite analyses the public was never afforded an

2    opportunity to review and critique.  Second, the Forest Service did not benefit from the

3    considerable knowledge that members of the public – such as EPIC – have with regard to these

4    issues.  As stated by the Ninth Circuit, in resolving an analogous situation:

5          While NEPA empowers neither the plaintiffs nor this court to second-guess the
           [agency's] management direction, it does require the [agency] to articulate, publicly and
6          in detail, the reasons for and likely effects of those management decisions, and to allow
           public comment on that articulation.

7
     Kern, 284 F.3d at 1073 (holding that agency guidelines never subjected to NEPA did not excuse
8
     agency from its responsibility under NEPA to perform an analysis of effects).  Given NEPA's
9
     unequivocal mandate to diligently involve the public, and for the above stated reasons, it therefore
10
     cannot be said that the Forest Service diligently involved the public in the preparation of the
11
     Divide Auger EA and thus the Divide Auger Timber Sale is unlawful.
12
     **II.  THE DIVIDE AUGER TIMBER SALE VIOLATES NFMA**
13
          **A. The Forest Service's Duty to Ensure Species Diversity and Viability**
14
              NFMA establishes a two-stage forest planning process.  At the first stage, the Forest
15
     Service prepares a "Land and Resource Management Plan," or, more simply, a 'Forest Plan.'  16
16
     U.S.C § 1604; 36 C.F.R. §§ 219.10(a)-(b) (1982).[17]  Once a Forest Plan is in place, the Forest
17
     Service implements the Forest Plan by proposing and assessing individual site-specific projects –
18
     such as the Divide Auger Timber Sale – that must be consistent with the Forest Plan.  16 U.S.C. §
19
     1604(i); 36 C.F.R. § 219.10(e).  In preparing and implementing Forest Plans, the Forest Service
20
     must "provide for diversity of plan and animal communities...."  16 U.S.C. § 1604(g)(3)(b).  This
21
     provision is implemented by the Forest Service through its planning regulations, which dictate
22
     that:
23
          Fish and wildlife habitat shall be managed to maintain viable populations of
24

25
          [17] The status of the Forest Service forest planning regulations – the "219" regulations – is currently in flux.
26   However, the planning regulations promulgated in 1982 control this case.  These regulations can be found at
     <<http://www.fs.fed.us/emc/nfma/includes/nfmareg.html>> (last visited April 14, 2004).
27
     PLAINTIFF'S MTN. & MEM. FOR SUM. JUDG. AND INJ. REL.                                    Page 31

existing native and desired non-native vertebrate species in the planning area.  For
planning purposes, a viable population shall be regarded as one which has the
estimate numbers and distribution of reproductive individuals to insure its
continued existence is well distributed in the planning area.  In order to insure that
viable populations will be maintained, habitat must be provided to support, at least,
a minimum number of reproductive individuals and that habitat must be well
distributed so that those individuals can interact with others in the planning area.

36 C.F.R. § 219.19.  "This duty to ensure viable, or self-sustaining, populations, applies with

special force to "sensitive" species.  <u>Inland Empire Public Lands Council v. U.S. Forest Service</u>,

88 F.3d 754, 759 (9th Cir. 1996) (citation omitted).  Furthermore, the Forest Service's "viability"

duty applies equally at both the Forest Plan and site-specific project level.  <u>Id.</u> at 760 n.6.

**B. MIS in the Mendocino National Forest**

To comply with its NFMA diversity obligations, as implemented through the viability

regulation, the Forest Service identifies "Management Indicator Species" ("MIS").  MIS were

selected in the Mendocino National Forest for two reasons.  First, because they "are believed to

represent the vegetation types, successional stages, and special habitat elements necessary to

provide for viable populations of all species in the Forest."  AR 1982.  Second, because MIS

"*population* changes are believe to indicate or represent the effects of management activities on

wildlife and fish."  <u>Id.</u> (emphasis added); <u>see also</u> 36 C.F.R. 219.19(a)(1) (MIS selected because

"*population* changes ... indicate the effects of management activities" (emphasis added)).

Thirteen MIS wildlife species were designated in the Mendocino National Forest: the Acorn

Woodpecker, Bald Eagle, Black-tailed Deer, California Thrasher, Douglas Tree Squirrel, Pacific

Fisher, Northern Goshawk, American Marten, Peregrine Falcon, Pileated Woodpecker, Northern

Spotted Owl, Tule Elk, and Western Gray Squirrel.  AR 1984.  These MIS thus function as a

bellwether – i.e., proxy – for the health of all of the Mendocino National Forest's 329 vertebrate

wildlife species (16 amphibian, 21 reptilian, 70 mammalian, 204 avian, and 18 fish).  AR 1982.

**C. The Forest Service's Failure to Comply with its Viability Duties**

**1. Concerns over Northern Goshawk, American Marten, Pacific Fisher, and
Northern Spotted Owl Viability**

1    According to the Wildlife BE, the Divide Auger Timber Sale could have direct and

2    indirect effects to MIS, in particular Northern Goshawk (AR 4545), American Marten (AR 4549),

3    and Pacific Fisher (AR 4552).  Additionally, the Wildlife BA, triggering its duty to engage in

4    formal consultation with the Fish and Wildlife Service, determined that the Divide Auger Timber

5    Sale "may adversely affect habitat for the northern spotted owl."  AR 4437.  Each of these MIS

6    was selected for their association and dependence on old growth and late-successional forests,

7    dead and down trees, and, except for the Northern Spotted Owl, riparian areas.  AR 1984.  Given

8    the impacts of the Divide Auger Timber Sale to these species, and their association and

9    dependence on late successional forests such as those threatened here, the Forest Service should

10    be especially cognizant of how the Divide Auger Timber Sale affects these species' viability.

11    Unfortunately, for these MIS, the Forest Service lacks population data.  For the Northern

12    Goshawk, the Forest Service completed only a single survey for a single logging unit – Unit 21 –

13    in 2002.  AR 4474.  For American Marten and Pacific Fisher, the Forest Service completed no

14    surveys and the only data pertaining to actual locations or populations of these species is based on

15    "[g]eneral furbearer track plate surveys ... conducted in portions of the Forest in 1993 and 2000."

16    AR 4476.  For the Northern Spotted Owl, while there is up-to-date survey information for the

17    southern logging units, the northern logging units are "not considered to be currently surveyed."

18    AR 4469.  In sum, only logging unit 21 for the Northern Goshawk, and the southern units for the

19    Northern Spotted Owl, contain adequate data sufficient to support a viability determination.

20    The Forest Service, however, disagrees, stating in its response to comments that:

21    [u]nder the LRMP dated February 1995, viable populations of [MIS] will be
      provided for by "maintaining moderate to high habitat capability, as desxcribed by

22    the habitat capability models found in Appendix E of the Forest Plan" (page IV-42
      Mendocino LRMP).  Although species population counts are collected on the

23    forest, impacts to the MIS population is based on the types and amount of habitat
      that currently exists throughout the forest.  When available, population counts are

24    also considered along with surveys ....

25    AR 4668.  This characterization – referred to as the "proxy on proxy" approach because it uses

26    habitat as a 'proxy' to determine whether viability of MIS 'proxy' is ensured – is, however, only

27

1   partially accurate and, regardless, an insufficient means of ensuring viability in the Divide Auger.

2   **2. The Forest Service's Monitoring Duties in the Mendocino National Forest**

3   The Forest Service's characterization is only partially accurate because while the Forest

4   Plan generally ensures viability through the protection of suitable habitat outlined in a "Wildlife

5   Habitat Capability Model," AR 2110, the Forest Plan also ensures viability by imposing explicit

6   monitoring obligations for MIS species.  AR 2081; see also 36 C.F.R. §§ 219.19(a)(1) &

7   219.11(d) (stating that a Forest Plan must establish "[m]onitoring and evaluation requirements

8   that will provide a basis for a periodic determination and evaluation of the effects of management

9   practices").  These monitoring obligations are critical because MIS species can only be used as

10  indicators of forest-wide species viability if MIS population changes can be correlated with

11  changes in habitat.

12  On two counts, there is absolutely no evidence in the record indicating that the agency has

13  actually complied with these monitoring duties.  First, the Forest Plan requires the agency to

14  "[e]valuat[e] ... all activities with the potential to cause changes in habitat capability for [MIS]."

15  AR 2098.  The agency must comply with this objective at the project level and provide an "annual

16  summary."  Id.  Nothing in the record indicates that these annual summaries were prepared or

17  integrated into the Divide Auger Timber Sale.  Second, the Forest Plan requires the agency "[t]o

18  assess whether MIS populations are being affected; to determine that selected MIS are

19  appropriate; and to determine whether standards and guidelines are effective."  Id.  This

20  monitoring requirement is met by evaluating the most recent inventory data and comparing that

21  data to the Wildlife Habitat Capability Models for two species per year on a rotating basis.  Id.

22  Again, nothing in the record indicates that these annual MIS assessments were prepared or

23  integrated into the Divide Auger Timber Sale.  These two failures strongly suggest that the

24  agency, by simply relying on the Wildlife Habitat Capability Models for MIS, without also

25  validating the Models by complying with its monitoring obligations, is flying blind by proceeding

26  with the Divide Auger Timber Sale and, by acting inconsistent with the Forest Plan, not ensuring

27

1    the diversity and viability of late successional wildlife.  16 U.S.C. § 1604(i); 36 C.F.R. §

2    219.10(e).

3         **3. The Proxy on Proxy Approach**

4         Simply relying on habitat as a proxy for ensuring viable populations of vertebrate species

5    is inherently suspect and, in many instances, unlawful.  See Idaho Sporting Congress v.

6    Rittenhouse, 305 F.3d 957 (9th Cir. 2002) (establishing presumption against use of "proxy on

7    proxy" approach unless sufficiently justified, and holding that Forest Service's use of "proxy on

8    proxy" approach was unlawful).  This is because MIS are identified expressly because they allow

9    the Forest Service to gauge the overall health and trends of other species within the forests

10   without incurring the time and expense of studying each species individually.  36 C.F.R.

11   219.19(a)(1); see Inland Empire, 88 F.3d at 762 n.11.  Moreover, the Forest Service's regulations

12   require that "[p]opulation trends of the [MIS] ... be monitored and relationships to habitat changes

13   determined."  36 C.F.R. § 219.19(a)(6); see also id. at § 219.12(d) ("each Forest Supervisor shall

14   obtain and keep current inventory data appropriate for planning and managing the resources under

15   his or her administrative jurisdiction").  The reason that it is necessary in most circumstances to

16   collect quantitative data concerning population data – both actual and trend – was articulated by

17   the Federal District Court for the District of New Mexico:

18       [MIS] represent a management short-cut – they are those species selected for their
         bellwether characteristics and whose populations generally can be quantitatively
19       ascertained and monitored .... Consequently, there is generally no reason to further
         short-cut the management monitoring process by relying on habitat trends to
20       project [MIS] species population data.

21   Forest Guardians v. Forest Service, 180 F.Supp.2d 1273, 1281-1282 (D. N.M 2001) (holding that

22   "the Forest Service is obligated by the plain language of NFMA's implementing regulations to

23   acquire and analyze hard population data of its selected [MIS] ... [and] it may not rely solely on

24   habitat trend data as a proxy for population data or to extrapolate population trends"); see also

25   Sierra Club v. Martin, 168 F.3d 1 (11th Cir. 1999) (holding that Forest Service had obligation to

26   collect population data, no just habitat trend data, for MIS).

27   PLAINTIFF'S MTN. & MEM. FOR SUM. JUDG. AND INJ. REL.                    Page  35

1    The Ninth Circuit has held that a "proxy on proxy" approach *may* be lawful in *limited*

2    instances.  Inland Empire, 88 F.3d at 763 & 763 n.12 (holding that it was lawful to "estimate[] the

3    effects of the alternatives on the population of [MIS] by analyzing the amount of the species'

4    habitat that would be reduced by each alternative" where "there is no technically reliable and cost-

5    effective method of counting individual members of the [MIS]").  Notably, the Ninth Circuit has

6    clarified its holding in Inland Empire.  In Rittenhouse, the Ninth Circuit limited Inland Empire to

7    its facts, stating that population data is required unless the agency can establish a sufficient

8    justification for not collecting and utilizing such data.  Rittenhouse, 305 F.3d at 972-973.  Inland

9    Empire's decision to uphold the use of "proxy on proxy" was based on the fact that "[t]he [Forest]

10   Service specifically found that for the smaller, more reclusive species, ... there is no technically

11   reliable and cost-effective method of counting individual members of the species."  Inland

12   Empire, 88 F.3d at 763 n.12; see also Utah Environmental Congress v. Zieroth, 190 F.Supp.2d

13   1265, 1271 (D. Ut. 2002) (distinguishing Inland Empire on basis that MIS were not "reclusive"

14   and finding that failed to provide "any documentation or record evidence that the [MIS]

15   population data ... could not have been reliably collected by the Forest Service"), Forest

16   Guardians, 180 F.Supp.2d at 1282 n10 (stating, "[u]nlike ... Inland Empire, the Forest Service is

17   not claiming here that any of the relevant [MIS] are reclusive, rare, or otherwise impractical to

18   survey").

19        Nothing in the administrative record demonstrates that the Northern Goshawk, American

20   Marten, Pacific Fisher, or Northern Spotted Owl are "reclusive" and that "there is no technically

21   reliable and cost-effective method" of collecting site-specific population data and this alone

22   invalidates the Forest Service's viability determinations.  Id.  Additionally, for several reasons, the

23   administrative record demonstrates that the Divide Auger Timber Sale is more analogous to the

24   situation in Rittenhouse where a monitoring report completed by the Forest Service indicated that

25   the Forest Plan's proxy on proxy approach was "invalid."  Rittenhouse, 305 F.3d at 967.

26        First, as discussed above, the Forest Service has not demonstrated compliance with its

27

1  Forest Plan monitoring objectives.  See supra at 33-35.

2          Second, the Forest Service has not taken a hard look at the cumulative impacts of the

3  Divide Auger Timber Sale to late successional wildlife and wildlife habitat – in particular, habitat

4  fragmentation and degradation to habitat that provides key connectivity between the Buttermilk

5  LSR and the Yolla Bolly – Middle Eel Wilderness.  See supra at 10-17.

6          Third, as stated by the Thomes Creek Watershed Analysis, for many species within the

7  area, including Northern Goshawk, American Marten, and Northern Spotted Owl, "there are not

8  sufficient data to determine either population counts within the watershed, or total amounts of

9  potential habitat."  AR 2652.  Additionally, the Watershed Analysis states that:

10          Collection of data on late-successional wildlife species on the Mendocino
            National Forest has been limited to monitoring of threatened and endangered
11          species for compliance with Section 7of the Endangered Species Act (ESA), and
            Research, Development, and Application (RD&A) inventories .... The present
12          analysis is limited by this lack of data and caution should be used when
            interpreting these data to determine future management activities.  Additionally,
13          knowledge of habitat characteristics selected for by northern spotted owls in this
            watershed is limited; the gathering of additional data in the future will assure
14          better habitat management.

15  AR 2684-2685.  These passages indicate that not only is data concerning the relationship of MIS

16  populations as correlated to habitat lacking, but that concrete data concerning habitat is also

17  lacking, thereby undermining blind reliance on a "proxy on proxy" approach to ensuring viability.

18          Fourth, the agency's position that it is ensuring viability and that impacts would not be

19  significant by protecting sufficient habitat in the Thomes Creek Watershed through, in part,

20  compliance with its 15% old growth and late-successional retention standard is not supported by

21  the record.  See e.g., AR 4648 (stating that "retaining 15% of the overstory trees within all timber

22  harvest units will maintain habitat for individual species utilizing mature/over-mature forests and

23  snag habitats").  In the Wildlife BA, the Forest Service admits that the retained trees in several

24  logging units (T2, S15, T20,and T21) "do[] not appear to meet the retention standards stated in the

25  [Forest Plan], [but] due to stand conditions, this mixture meets the intent of the plan."  AR 4415.

26  Compliance with the "intent" of the Forest Plan is apparently justified based on the assertion in

27

1    the Wildlife BA that "the large diameter trees retained within the M4P are equivalent to those in

2    M4G in terms of quality.  The only difference between the M4P stands and the M4G stands are

3    the density, rather than size, of the trees."   AR 4415.

4         Yet this equivalency is undermined by the fact that suitable nesting and roosting habitat

5    for the Northern Spotted Owl "consists of M4G and M6G [stands with] a minimum of 60%

6    canopy closure" and suitable foraging habitat consists of "nesting" and "M3G, M4P, R4X, and

7    C4X (C4P & C4G) with a minimum of 40% canopy closure."  AR 4423.  Similarly, for American

8    Marten and Pacific Fisher, suitable habitat consists of, in relevant part, "D4X, M3G, M4G, M6G,

9    and R4X" with a "canopy closure not less than 40%."  AR 4475.  Turning to the agency's

10   explanation of timber strata, the specific difference between M4P and M4G is that M4P stands

11   have a crown closure 20-39%, while M4G stands have a crown closure of 40% and above.  AR

12   4442.  Thus, the agency's partial rationale for why it met its hard look duty – that it is retaining

13   15% of the trees within each logging unit – does not pass muster because the retained trees do not

14   satisfy the canopy closure requirements for Northern Spotted Owl, American Marten, or Pacific

15   Fisher, and do not conform to the Forest Plan's retention standards.  The agency should have been

16   forewarned given the fact that the Thomes Creek Watershed Analysis states that "[t]he ... M4P ...

17   timber strata ... may not provide habitat for ... late-successional associated species that were

18   intended to be assured habitat under the 15 percent late-successional standard."  AR 2686.

19        Fifth, and finally, in the specific context of Northern Goshawk, the Forest Plan specifically

20   states that "[i]nventory of [lands outside of LSRs and other reserved lands – i.e., matrix lands]

21   will be completed as a part of project planning."  AR 2028.  This data is necessary to ensure

22   compliance with several Northern Goshawk-specific management protections obligating the

23   Forest Service to: (1) establish primary nest zones around last known nests, and maintain 60% of

24   that nest zone (300 acres) in dense mature forest cover; (2) establish a foraging habitat zone of a

25   1.0 mile radius circle (1506 acres) centered on the primary nest zone within which to maintain

26   60% (900 acres) in a mosaic of mid-mature to late successional forest condition; and (3) restrict

27

1    habitat modifying activities between March 1st and August 31st within primary nest zones, and

2    restrict loud and/or continuous noise within 14 miles of active nest sites during the same timer

3    period.  AR 2028.  Thus, in the context of the Northern Goshawk, outside of logging Unit 21

4    where the Forest Service did complete a survey in 2002, the agency has not ensured the viability

5    of the species because it has not collected population data, and, in so doing, has effectively done

6    an "end run" around its Forest Plan obligations designed expressly to protect this species.

7        Because the Forest Service cannot demonstrate that there is no technically reliable and

8    cost-effective method to collect population data for Northern Goshawk, American Marten, Pacific

9    Fisher, and Northern Spotted Owl throughout the analysis area for the Divide Auger Timber Sale,

10   and because the evidence in the record points to a definitive need to obtain such population data to

11   validate the Forest Plan's approach to ensuring viability, and to ensure that substantive protections

12   are implemented, the Divide Auger Timber Sale is unlawful.

13                                       **CONCLUSION**

14       Severe procedural and substantive flaws within the decisionmaking process for the Divide

15   Auger Timber Sale render the decision to proceed with commercial logging unlawful.  Reduced to

16   their essence, these flaws reflect the agency's fixation on commercial logging at the expense of

17   our National Forests.  If the Forest Service desires to rely on commercial logging, it must

18   understand that this does not obviate – and indeed, here, enhances – the need to take a hard look at

19   cumulative impacts, adequately justify its FONSI, consider a reasonable range of alternatives,

20   diligently involve the public, and ensure the diversity and viability of the wildlife species that call

21   the Mendocino National Forest home.

22        For all of the foregoing reasons, the decision to proceed with the Divide Auger Timber

23   Sale is "arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with the

24   law" and "without observance of procedure required by law." 5 U.S.C  §§ 706(2)(A), (D).

25   Plaintiff therefore respectfully requests that this Court grant its motion for summary judgment and

26   injunctive relief.  The Forest Service should be enjoined from any further implementation of the

27

1  Divide Auger Timber Sale pending a demonstration that the agency has complied with its duties

2  under NEPA and NFMA.

3

4  Respectfully submitted this <u>14th</u> day of April, 2004,

5

6                                      /s/ Erik Schlenker-Goodrich
                                       Erik Schlenker-Goodrich
7                                      Peter M.K. Frost
                                       Counsel for Plaintiffs
8                                      Environmental Protection Information Center

9
                                       /s/ Sharon E. Duggan
10                                     Sharon E. Duggan
                                       Local Counsel for Plaintiffs
11                                     Environmental Protection Information Center

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27